# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

ENRICO THORNTON,

                Plaintiff,

     v.

OFFICER TAUHEED W.
EL-AMIN, OFFICER CASEY T.
BENTON, TERRELL BOLTON,
and DEKALB COUNTY, each
officer in their individual capacities
as employees of the DeKalb County
Police Department

                Defendants.

1:10-cv-474-WSD

## OPINION AND ORDER

This matter is before the Court on Defendants Officer Casey Benton, Former

Chief of Police Terrell Bolton, and DeKalb County's (collectively, "Defendants")

Motion for Summary Judgment [85] and on Plaintiff Enrico Thornton's Motion for

Partial Summary Judgment [87]. Also before the Court are various procedural and

evidentiary objections by the parties. [111, 113, 115, 122].

## I.    BACKGROUND

This lawsuit involves the apprehension and arrest of Plaintiff by Officer

Benton and Officer Tauheed W. El-Amin during the early morning hours of

Saturday, August 2, 2008. The evidence primarily consists of the conflicting testimony of Officer Benton and Plaintiff, who describe significantly different versions of the arrest, Plaintiff's statements to the DeKalb County Police Department Internal Affairs Unit ("Internal Affairs") as part of his complaint against Officers Benton and El-Amin, and Officers Benton and El-Amin's employment files. Plaintiff has also submitted into evidence a transcript of sworn testimony that El-Amin gave during a hearing in the DUI case that arose from Plaintiff's arrest, which concerned whether Plaintiff's refusal to submit to a blood-alcohol test could be used as evidence against him in that case.[1]

Plaintiff's Testimony

Plaintiff's version of events begins Friday, August 1, 2008. He spent the afternoon with his four children at their mother's home. (Thornton Dep. 77:7-79:9). At around 8:00 p.m., he picked up a cousin and went to another cousin's home, where he stayed with his two cousins and some other individuals from about 9:00 p.m. until approximately 4:00 a.m. (Id. at 74:4-75:22). They spent the evening watching TV but did not consume any beer. (Id. at 74:20-75:7). Plaintiff then left the gathering in his gold-colored minivan with the cousin he had picked

---

[1] El-Amin is no longer with the DeKalb County Police Department, is not represented by the County, and has not participated in this action. The County insists it is unable to locate him and he has not been deposed. On May 6, 2011, the Court ordered the Clerk to place on entry of default on the docket against El-Amin.

up earlier in the evening.  They went to a club to pick up Plaintiff's cousin's sisters, but when they arrived they found that the cousin's sisters already had left. (Id. at 145:20-151:22).  Plaintiff dropped his cousin off at the cousin's home, and headed toward Plaintiff's residence.  (Id. at 72:19-73:22).

As Plaintiff was driving home on Candler Road, his front passenger-side tire blew out.  (Id. at 69:8-12).  He called another cousin from his cell phone and asked the cousin to come pick him up.  (Id. at 69:8-16).  He pulled over into a parking lot at the intersection of Candler and McAfee Roads.  (Id. at 69:8-12, 72:1-2)  Leaving his cell phone behind, (id. at 124:18-125:2), Plaintiff exited the van and looked at the flat tire, (id. at 82:20-23).  Plaintiff knew he did not have a spare, so he walked across Candler Road to wait for his cousin to arrive.  (Id. at 69:8-16)

Plaintiff was on the side of the road across from where his van was parked when he saw a police car parked behind his van.  (Id. at 69:19, 88:3-89:24).  He later learned that the police car was driven by El-Amin.  (Id. at 89:23-24). El-Amin did not have on his sirens and Plaintiff did not know why El-Amin had pulled behind the van.  (Id. at 88:12:17)

Plaintiff was still across Candler Road when he first encountered Officer Benton:

> That's when I heard the other police car, the motor of the police car; and as I turned around, I saw [Officer Benton's] police car coming

> toward me. . . . As he was coming toward me, he was coming real
> fast. So the only thing I did was just put my hands up. He hit me with
> the car. . . I fell on top of the car. . . . When the police car struck me in
> my leg, it knocked me forward . . . to where I landed on the police car
> [face down with my arms stretched out]. I raised back up and I still
> put my hands up like that. . . . That's when he told me to get on the
> ground. . . . The officer that struck my leg . . . jumped out of the car
> and he pulled his gun and he was like get on the ground. So at the
> time I got on the ground.

(Id. at 90:19-91:17).[2] Plaintiff suffered a bruise or bruised bone at the lower, front

and side of his left knee, and was told it would take about four weeks to heal. (Id.

at 42:15-44:17). He testified that his leg "hurt[] just a little" right after he was hit

by Officer Benton's car, that his leg was "just bruised," and that later it fully

healed. (Id. at 121:6, 164:18-21).

After Officer Benton ordered Plaintiff to the ground, El-Amin came over to

the side of the road where Plaintiff was and handcuffed him. Before doing so,

Plaintiff claims that El-Amin kicked him in the ribs. (Id. at 92:23-25). Plaintiff

blacked out for about a minute after that. (Id. at 70:2-5). Plaintiff later learned that

the kick in the ribs cracked two ribs and chipped of a piece of bone. (Id. at 161:9-

13). The chipped bone is still loose in his body and continues to cause him pain.

(Id. at 163:20-164:4). It also interferes with his ability to perform many of the

---

[2] According to the notes from Plaintiff's interview with Internal Affairs, his feet
did not leave the ground when he was struck by the police car. (Pl.'s Mot. Summ.
J. Ex. 7).

labor-intensive jobs he has held off-and-on over the past several years. (E.g., id. at 38:16-23).

After Plaintiff was handcuffed, the officers took Plaintiff back across Candler Road to where Plaintiff's van was parked. (Id. at 96:15-97:2). Officer Benton left the area and Officer El-Amin's supervisor arrived. (Id. at 97:4-6, 111:21-23). Plaintiff did not tell anyone there that he was hurt, never asked for medical attention, and was not bleeding. (Id. at 141:14-143:10). After some time passed, Officer El-Amin and another officer took Plaintiff to the DeKalb County jail. At the jail, a nurse saw that Plaintiff was holding his right side and asked him what was wrong. (Id. at 100:7-17). Plaintiff said he had been kicked in the ribs and the nurse asked the officers whether Plaintiff had been taken to a hospital. (Id.). They responded that he had not, and the nurse refused to admit Plaintiff into the jail. (Id.).

The officers then left the room and El-Amin returned five minutes later. (Id. at 100:18-23). El-Amin told Plaintiff to come with him, stating further that Plaintiff was going home. (Id. at 100:21-23). Plaintiff went with El-Amin to El-Amin's patrol car, and El-Amin drove Plaintiff to Grady Hospital, arriving at approximately 6:00 a.m. (Id. at 100:23-101:1). El-Amin let Plaintiff out of the patrol car and left. (Id.).

Plaintiff did not believe at that time that he needed medical treatment, (id. at 120:20-23, 121:16-24), and so instead of seeking treatment at Grady Hospital he accepted a ride back to his home from a stranger, (id. at 122:1-124:8).  Plaintiff spent the rest of Saturday, and all day Sunday, at his home.  He took some Tylenol for his pain and placed an ice pack on his hurt ribs and bruised knee.  (158:9-20).  On Sunday, he started coughing up blood, and on Monday he went to DeKalb Medical's emergency room.  (Id. at 45:15-22).

Plaintiff learned at the hospital that he had a fractured rib with a dislodged bone chip, and a bruise on his knee.  (Id. at 46:1-10, 161:3-164:21).  He was given some pain and anti-inflammatory medication, (id. at 161:16-17), but he did not receive any other treatment, bandages, or bindings, (id. at 162:10-17).  He was told his injuries would heal on their own, that his ribs would take about six or eight weeks to heal, his bruised knee about four to six weeks, and that he should have a follow-up visit with a physician to verify that he was healing properly.  (Id. at 162:22-163:8).  At Plaintiff's follow-up visit, he learned that his injuries were healing well but that the chipped bone floating in his body would continue to cause him problems until he had it surgically removed.  (Id. at 163:20-164:10).  Since then, Plaintiff's bruised knee has healed but he continues to experience trouble

with the chipped bone, which he has not had removed because he cannot afford the cost of the surgery. (Id. at 164:15-21, 165:4-17).

After his arrest on August 2, 2008, Plaintiff received a citation in the mail, ordering him to appear in court in November 2008 on a misdemeanor DUI charge. (Id. at 181:11-18). He appeared for the November 2008 hearing and pleaded not guilty to DUI and some other charges against him. Officer El-Amin testified at the hearing. (Id. at 182:2-12). Plaintiff was told to report for another hearing in December 2008. Another hearing was held in January 2009. At that hearing, the DUI charges against Plaintiff were dropped. (Id. at 183:9-13).

Officer El-Amin's Testimony

Officer El-Amin is currently in default in this action and did not provide testimony regarding Plaintiff's arrest on August 2, 2008. On January 8, 2009, however, El-Amin offered testimony in the State Court of DeKalb County in connection with DUI charges brought against Plaintiff (the "Hearing). During the hearing El-Amin described the events of Plaintiff's arrest, and his later release.

El-Amin testified that at approximately 4:00 a.m., he was parked in a parking lot on the east side of Candler Road looking west. (Hearing Tr. 18:4-20). He heard a loud noise and saw a van driving south on Candler Road with two right-side flat tires. (Id. at 6:16-24). A few seconds after the vehicle passed him,

El-Amin pulled behind the vehicle intending to conduct a traffic stop.  (Id. at 7:2-11).  Before he turned on his lights or signaled the driver to pull over, the van turned into a parking lot at the intersection of Candler and McAfee Roads.  (Id. at 7:8-22).

The driver, later identified as Plaintiff, got out of the vehicle and walked around to look at the damage to the van.  (Id. at 8:1-2).  El-Amin drove past the parked van and observed in the rearview mirror that the right side of the vehicle had sustained damage up past the headlight.  (Id. at 8:4-11).  He made a U-turn and pulled in behind the vehicle.  (Id.).  When he did, Plaintiff saw El-Amin's car and began to walk away.  (Id. at 8:4-21).  El-Amin got out of his car and asked Plaintiff to stop.  (Id. at 8:18-21).  Plaintiff "turned around, paused, and took off, running." (Id.).

El-Amin got back in his vehicle, put out a radio message that a suspect was running down Candler Road, and then started following Plaintiff as Plaintiff ran down and across Candler Road.  (Id. at 8:23-25, 22:13-14).  El-Amin took Plaintiff into custody without assistance from anyone, and took Plaintiff back to Plaintiff's vehicle.  (Id. at 9:3-8, :20-21).  El-Amin struck a dumpster with his car during the chase, so his supervisor came out with paperwork for the accident.  (Id. at 10:2-4).  El-Amin observed that the damage to Plaintiff's vehicle was not consistent with

hitting a curb, that Plaintiff's vehicle had damage on the front-passenger side up and above the headlight and down the right side of the vehicle, and the damage appeared to be fresh. (Id. at 10:18-11:13). El-Amin testified that he saw an open bottle of beer in the vehicle within reach of the driver, although he could not recall whether the bottle was empty or full. (Id. at 16:5-20). According to El-Amin, Plaintiff stated that he was coming from a nightclub named Club Ice, and that he had struck a curb. (10:11-17).

El-Amin transported Plaintiff to the DeKalb County jail. (Id. at 24:14-16). Plaintiff was not booked at the jail and, instead, El-Amin drove Plaintiff to Grady Hospital, walked him to the front door, and left him there. (Id. at 24:20-25:2).

In January 2009, after El-Amin's testimony at the Hearing, the charges against Plaintiff were dropped. The *nolle prosequi* form filed by the government stated that the state's chief witness's credibility had been called into question.

Officer Benton's Testimony

Officer Benton testified that he was on Candler Road less than a mile from the site of Plaintiff's arrest when he heard El-Amin state over the radio that a suspect was fleeing on foot. (Benton Dep. 27:16-28:1). Officer Benton responded travelling north along Candler Road when he saw someone who matched the description given by El-Amin over the radio, on his right running through a

parking lot.  (Id. at 29:5-30:14).  The person, later identified as Plaintiff, was

approximately 60 feet away, running parallel to Candler Road in the opposite

direction in which Office Benton was driving.  (Id. at 29:5-30:14, 34:11-17).

Plaintiff ran past Officer Benton.  Officer Benton immediately took a right turn

into the parking lot and headed toward Plaintiff.  (Id. at 31:23-32:20).  By the time

Officer Benton entered the parking lot, Plaintiff was near the opposite end of the

lot.  (Id. at 32:23-33:2).

Officer Benton drove through the parking lot at less than twenty miles per

hour.  (Id. at 34:22-25).  He intended to get close to Plaintiff and then pursue him

on foot.  As Officer Benton approached, Plaintiff abruptly stopped running.  (Id. at

50:10-14).  Officer Benton slammed on his breaks, but was unable to stop in time

to prevent hitting Plaintiff in the knee.  (Id. at 50:1-6, 51:9-10).  The force of the

impact knocked Plaintiff forward and caused his hands to hit against the hood.  (Id.

at 5-6).  Officer Benton did not deny hitting Plaintiff with the police car, but he

claimed it was accidental.  He agreed, in hindsight, he should have left more space

between his car and Plaintiff.  (Id. at 38:11-21).

Officer Benton got out of his vehicle, drew his gun, and ordered Plaintiff to

lie on the ground.  (Id. at 55:4-8).  Plaintiff complied.  (Id. at 55:9-10).  Officer El-

Amin then arrived on foot and handcuffed Plaintiff.  (Id. at 48:6-10, 55:23-24).

Officer Benton was a few feet away from Officer El-Amin at that time.  (<u>Id.</u> at 48:9-11).  He did not observe El-Amin kick Plaintiff but admitted that it could have happened without him seeing.  (<u>Id.</u> at 64:10-14, 65:6-8).

Officers Benton and El-Amin took Plaintiff back across Candler Road to Plaintiff's van.  Officer Benton observed "severe damage to Mr. Thornton's van, two flat tires and other damage that looked like it may have come from an accident, a recent accident."  (<u>Id.</u> at 124:2-6).  Plaintiff gave Officer Benton "no indication or complaints of injuries."  (<u>Id.</u> at 70:2, 124:13-14).  A few minutes after returning to Plaintiff's van, Officer Benton left the scene and did not further interact with Plaintiff.  (<u>Id.</u> at 53:3-8).

<u>Plaintiff's Internal Affairs Complaint</u>

On August 7, 2008, Plaintiff complained about his August 2008 arrest to Internal Affairs and submitted a written, signed statement.  (Complaint Form, Thornton Dep. Ex. 1 (the "IA Complaint")).  The IA Complaint contains a slightly different version of events than Plaintiff's deposition testimony.  Plaintiff stated that his front, passenger side tire blew out, which caused him to hit the curb.  (<u>Id.</u> at 1).  He left his vehicle because his tires were flat and he did not have a spare.  (<u>Id.</u>

at 2).[3]  He saw Officer El-Amin as he was walking away from his van, but none of the officers said anything to him until after Officer Benton hit Plaintiff with the car.  (Id.).  While he was on the ground, Officer El-Amin kicked Plaintiff in the ribs.  (Id. at 2-3).  His leg and ribs were injured, but he did not tell the officers he was hurt and he did not request medical assistance.  (Id. at 3-4).  At the police station,[4] a nurse asked Plaintiff why he was holding his side and Plaintiff said that he had been kicked.  (Id. at 4-5).  Officer El-Amin said that Plaintiff had been in an accident and the lady asked whether Plaintiff had received any medical assistance.  (Id.).  El-Amin stated that Plaintiff had not.  (Id.).  El-Amin drove Plaintiff to Grady Hospital, dropped him off, returned to his car, and left.  (Id.).

Plaintiff stated that prior to being arrested he had consumed two alcoholic beverages.  (Id. at 5).  Plaintiff later explained that he only said that he had consumed alcohol because he overheard El-Amin say that two open bottles of beer had been found in the van, and because he had misunderstood the question.

---

[3] According to the notes from Plaintiff's interview with Internal Affairs, Plaintiff eventually admitted that he "jogged" away from his vehicle, and that it could have been interpreted as fleeing.

[4] The jail and police station are next to each other, and during his deposition Plaintiff used the terms police station and jail interchangeably.

(Thornton Dep. at 143:14-145:13).  Plaintiff also stated that before the incident in the parking lot he had been at a club.  (IA Compl. at 5).[5]

Plaintiff confirmed that he went to DeKalb Medical hospital on Monday, August 4, 2008.  (IA Compl. at 6).  He learned that his "leg was OK just bruised," but that his "ribs were cracked and one had a piece of bone missing from it."  (Id.).

Internal Affairs interviewed Officers Benton and El-Amin about Plaintiff's complaint.  (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 2).[6]  It concluded that Plaintiff was struck by Officer Benton's car by accident, but that it was preventable.  (Id.).  Officer Benton received written counseling.  Internal Affairs further concluded that the evidence was insufficient to prove or disprove Plaintiff's allegations that he was kicked in the ribs.  (Id.).

Procedural Background

On January 15, 2010, Plaintiff filed this action against Officers El-Amin and Benton, the DeKalb County Chief of Police, and DeKalb County.  The Complaint

---

[5] In his deposition testimony, Plaintiff stated that he had been at the club, but that he had only stopped there to give some friends a ride home.  (Thornton Dep. at 145:20-151:22).  This is consistent with Internal Affair's notes from Plaintiff's initial interview, which reported Plaintiff as stating that he had been at a club on Memorial Drive prior to the incident.

[6] Plaintiff was asked by Internal Affairs to submit to a voice stress analysis. Plaintiff refused on the grounds that his ribs hurt and it hurt him to breathe.  (IA Compl. at 6).  The Internal Affairs report states that Plaintiff was contacted on three additional occasions to schedule a test and that he failed to respond.

alleged that the defendants violated Plaintiff's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments, and also claimed various violations of state law, including assault, battery, kidnapping, false arrest, false imprisonment, intentional infliction of emotional distress, negligent hiring, training, supervision, and retention, violations of ministerial duties, and violations of Georgia' Racketeer Influenced and Corrupt Organizations ("RICO") Act. The assault and battery claims arise from Officer Benton striking Plaintiff with the police car and Officer El-Amin allegedly kicking Plaintiff in the ribs.

The defendants removed the action to this Court. The parties later agreed to drop the current DeKalb County Chief of Police and to add as a defendant Former Chief Bolton, who was chief at the time of Plaintiff's arrest. Plaintiff filed a Second Amended Complaint [79], claiming that DeKalb County partially waived its sovereign immunity by purchasing motor vehicle insurance and that Officer Benton was negligent when he struck Plaintiff with the police car.

The parties have completed discovery and their fully briefed cross-motions for summary judgment are now before the Court. Defendants move for final summary judgment on all of Plaintiff's claims. Plaintiff seeks summary judgment that Officer Benton was negligent when he struck Plaintiff with the police car and that Defendant DeKalb County is liable for Officer Benton's negligence.

## II.    DISCUSSION

### A.    Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "*to the extent supportable by the record*." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Plaintiff's Motion For Summary Judgment

Plaintiff seeks summary judgment on whether Officer Benton acted negligently when he struck Plaintiff with the police car and whether DeKalb County waived its sovereign immunity with respect to the collision.

1.    *Negligence*

Ordinary negligence is the failure to take "that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances." Ga. Code Ann. § 51-1-2. "The essential elements of a negligence claim are the

existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages." Boller v. Robert W. Woodruff Arts Center, Inc., 716 S.E.2d 713, 716 (Ga. Ct. App. 2011) (internal quotation marks omitted).

It is undisputed that Officer Benton struck Plaintiff with Officer Benton's police car and bruised Plaintiff's knee. Plaintiff seems to argue that if Officer Benton utilized the degree of care that would have been exercised by an ordinarily prudent person under the same or similar circumstances, Officer Benton would not have followed Plaintiff so closely with his car and would not have struck Plaintiff when Plaintiff suddenly stopped running. Officer Benton stated that Plaintiff was running and then abruptly stopped resulting in Benton's car striking Plaintiff. Even though Officer Benton stated he should have left more room between his car and Plaintiff as he pursued him, the Court cannot conclude that no reasonable juror would find that Officer Benton was not negligent and summary judgment on Plaintiff's negligence claim is denied.

2.    *Waiver Of Sovereign Immunity*

The Georgia Constitution provides for sovereign immunity under state law to the State and to its counties. Toombs Cnty. v. O'Neal, 330 S.E.2d 95, 97 (Ga. 1985) (citing Ga. Const. art. I, § II, ¶ IX); see also Hill v. DeKalb Reg'l Youth Det.

Ctr., 40 F.3d 1176, 1197 n.36 (11th Cir. 1994) ("Even if Dekalb county had any liability under state law, . . . a county and its officers sued in their official capacities have the same sovereign immunity protection as the state."); Payne v. DeKalb Cnty., 414 F. Supp. 2d 1158, 1182 (N.D. Ga. 2004) (state law claims against DeKalb County and its officials in their official capacities barred in absence of statutory waiver of sovereign immunity). A Georgia county is not liable under state law "unless made so by statute." Ga. Code Ann. § 36-1-4. Plaintiff seeks summary judgment that DeKalb County has waived sovereign immunity for Plaintiff's loses arising from Officer Benton's allegedly negligent use of the County's police car.

Georgia law states:

(a) The sovereign immunity of local government entities for a loss arising out of claims for the negligent use of a covered motor vehicle is waived up to the following limits: . . .
　　(3) $ 500,000.00 because of bodily injury or death of any one person in any one occurrence, an aggregate amount of $ 700,000.00 because of bodily injury or death of two or more persons in any one occurrence, and $ 50,000.00 because of injury to or destruction of property in any one occurrence, for incidents occurring on or after January 1, 2008.
(b) The sovereign immunity of local government entities for a loss arising out of claims for the negligent use of a covered motor vehicle is waived only to the extent and in the manner provided in this chapter and only with respect to actions brought in the courts of this state.

Ga. Code Ann. § 36-92-2. A "covered motor vehicle" means any motor vehicle "owned," "leased or rented" by the local governmental entity, which covers the police car that Office Benton drove. Id. § 36-92-1(2). A "local government entity" includes a county, such as DeKalb County. Id. § 36-92-1)3). Finally, the incident in question here occurred after January 1, 2008.[7]

Thus, the question whether DeKalb County's sovereign immunity has been waived does not seem to be at issue, since the statutory language clearly provides that DeKalb County's sovereign immunity for the negligent operation of its motor vehicles by its officers and agents is waived up to $500,000.

Another section of the Georgia Code provides that the sovereign immunity of counties is waived up to $500,000 for losses arising out of the negligent use their motor vehicles, as specified by Code Section 36-92-2, but that counties are authorized to waive their immunity in a greater amount by purchasing motor vehicle liability insurance for that greater amount. Ga. Code Ann. § 33-24-51(b).

---

[7] The statute waives sovereign immunity for actions brought in Georgia courts. This action was originally brought in Georgia state court and was removed to this court by DeKalb County. Under these circumstances, the County has voluntarily waived immunity to suit in this Court to the same extent as its statutory waiver in state court. See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613 (2002). Defendants have not contested the Court's authority to decide the state law claims against it other than to argue that the doctrine of sovereign immunity applies to the claims for reasons that do not depend on whether the action is in federal or state court.

The statute does not say that sovereign immunity is only waived if a county purchases automobile liability insurance. See Glass v. Gates, 716 S.E.2d 611, 613-14 (Ga. Ct. App. 2011) (distinguishing between mandatory waiver of sovereign immunity under Section 36-92-1 and voluntary waiver under Section 33-24-51).

The parties argued during discovery over the production of DeKalb County's motor vehicle insurance policy. DeKalb County ultimately provided a copy to Plaintiff's counsel during the briefing for the motions for summary judgment, and Plaintiff filed a copy of the policy with his Reply supporting his Motion for Summary Judgment. The Policy covers bodily injury liability of $500,000 per person per accident, (Reply Pl.'s Mot. Summ. J. Ex. 2), which is the same as the mandatory statutory waiver of sovereign immunity for a county's negligent use of motor vehicles, which exists independently of a county's decision to purchase liability insurance. It does not appear that the existence or non-existence of a liability policy is relevant to any of the issues in this case, but it provides a second basis for finding that DeKalb County would be liable for Officer Benton's alleged negligent act of striking Plaintiff with his car, if Officer Benton is determined to be negligent.

Plaintiff's Motion for Summary Judgment thus is granted in part and denied and part. The Court denies summary judgment on the issue of Officer Benton's

negligence and grants it with respect to DeKalb County's liability for Officer

Benton's negligence, if such negligence is found. The Court now turns to

Defendants' Motion for Summary Judgment on Plaintiff's constitutional and state

law claims against Defendants.[8]

      C.      <u>Plaintiff's Constitutional Claims Under Section 42 U.S.C. § 1983</u>

Plaintiff claims that "[t]he actions of the Defendants violated Plaintiff's

constitutional rights, including the Fourth, Fifth, and Fourteenth Amendments."

(Second Am. Compl. ¶ 9). Other than incorporating the jurisdictional allegations,

this is the extent of Plaintiff's allegations of constitutional violations. The parties,

however, have adopted the working assumption that the conduct that allegedly

violated various duties under state tort law also is the basis of the claimed

constitutional violations.

Section 1983 provides: "Every person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be

subjected, any citizen of the United States . . . to the deprivation of any rights,

---

[8] Defendants object [115] to the admissibility of certain unauthenticated evidence
submitted by Plaintiff in his reply in support of his Motion for Summary Judgment.
They specifically object to the introduction of Plaintiff's medical records and to
webpage printouts of certain scientific calculations Plaintiff apparently uses to
show how fast Officer Benton was driving. The evidence, however, was not used
to rule on Plaintiff's Motion for Summary Judgment. The Court therefore finds
that Defendants' objection is moot.

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. While not a source of substantive rights, Section 1983 provides a method for vindicating federal rights conferred by the Constitution and federal statutes. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).

To prevail in an action under Section 1983, a plaintiff must make a *prima facie* showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law. Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992) ("A successful section 1983 action requires a showing that the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States."). The parties do not question that Officers Benton and El-Amin acted under color of law. The question instead is whether no reasonable jury could find that the claimed constitutional violations occurred.

### 1. *Claims Against DeKalb County*

Plaintiff's allegations are nearly entirely asserted against generic, undifferentiated "Defendants."  Among these Defendants are DeKalb County and the individual defendants in their official capacities.  Suits under Section 1983 against officials in their official capacity are "simply 'another way of pleading an action against an entity of which an officer is an agent.'"  Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (quoting Kentucky v. Graham, 473 U.S. at 159, 165 (1985)).  The official capacity claims in this case are redundant and are not required to be addressed separately from the claims against the County.  See Pompey v. Broward Cnty., 95 F.3d 1543, 1545 n.2 (11th Cir. 1996) ("we treat [the official capacity] claims as claims against the County"); Busby, 931 F.2d at 776.

Plaintiff cannot rely on a theory of *respondeat superior* to hold DeKalb County liable for the conduct of its officers.  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

> It is only when the execution of the government's policy or custom inflects the injury that the municipality may be held liable.  A county does not incur § 1983 liability for injuries caused solely by its employees.  Nor does the fact that a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee infer municipal culpability and causation.  Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a

custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.

Id. (internal quotation marks and citations omitted).

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). Plaintiff has not identified any official policies that he claims are facially invalid.

"A custom is a practice that is so settled and permanent that it takes on the force of law." Id. To establish a custom, a plaintiff must demonstrate a widespread practice that is persistent and widespread. See Turner v. Jones, 415 F. App'x 196, 202 (11th Cir. 2011); Brown v. City of Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991). Plaintiff appears to allege the existence of customs of using excessive force, denying medical care to arrestees, and dumping undesirables in neighboring counties. (E.g., Resp. Pl.'s Mot. Summ. J. 7).

a.     Denial Of Medical Care

Plaintiff claims that the County has a custom of denying medical care to injured arrestees by taking them to jail rather than to a hospital to have the arrestees' injuries treated. The Supreme Court has held that the Fourteenth

Amendment's Due Process Clause requires the responsible government "to provide medical care to persons . . . who have been injured while being apprehended by the police." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). The injured detainee's right, however, is only to *receive* needed medical treatment; a government has no obligation to *pay* for that treatment. Id. at 244-45. The Revere Court held that a government may satisfy its obligations by, for example, sending the detainee to a hospital willing to provide emergency care to indigent or uninsured patients. Id. at 245. The emphasis is on whether the arrestee or detainee has the opportunity to receive medical care, not on how or where the care is provided.

The Eleventh Circuit has applied the "deliberate indifference" standard to pretrial detainee claims of inadequate medical treatment. Thomas v. Town of Dixie, 847 F.2d 771, 772-73 (11th Cir. 1988). This requires that the official have knowledge of the need for medical care and intentionally refuse to provide that care. Lancaster v. Monroe Cnty., 116 F.3d 1419, 1425 (11th Cir. 1997).

The undisputed facts in this case demonstrate that Officers Benton and El-Amin did not violate Plaintiff's constitutional rights by showing deliberate indifference to his medical needs. Plaintiff was not bleeding or showing external signs of trauma. (Thornton Dep. 143:8-10). Plaintiff never told the officers that he

was injured and he never requested medical care.  (Id. at 141:14-143:7).  Plaintiff

himself expressly stated that he did not feel like he required medical attention at

that time.  (Id. at 120:20-23).  That admission itself practically concludes the

inquiry; the officers could have been deliberately indifferent to medical care that

Plaintiff himself did not believe he required.  The facts here are further than when

Plaintiff indicated at the jail that his side hurt, jail officials indicated he would not

be processed until he visited a medical facility.  When Plaintiff was taken to the

hospital where he could have received medical care, he chose to go home because

he did not deem his injuries significantly serious to warrant medical attention at

that time.  (120:13-121:24).  It was not until at least a day later that Plaintiff

decided he required medical care.

Based on these undisputed facts, the Court concludes as a matter of law that

Plaintiff's Fourteenth Amendment rights were not violated by Officers Benton and

El-Amin's alleged deliberate indifference to Plaintiff's medical needs.[9]  Because

Plaintiff cannot show "that his constitutional rights were violated" by the claimed

---

[9] The Court further notes that Revere only prohibits governments from denying
medical care to detainees but does not mandate how that care is provided and does
not require that the government pay for the care.  Plaintiff has not shown how,
even after he disclosed his injury (without requesting medical assistance), taking
him to Grady Hospital for treatment would have been a constitutional violation..

failure to provide medical treatment to him, McDowell, 392 F.3d at 1289, he

cannot impose liability on the County for that conduct.

        b.    "Dumping"

Plaintiff also alleges that DeKalb County has a policy of "dumping," that is,

"of solving its homelessness problem by having police officers take homeless

people to neighboring counties." Williams v. DeKalb Cnty., 327 F. App'x 156,

162-63 (11th Cir. 2009). The Williams court concluded that the plaintiff in that

case provided sufficient proof of the policy to survive summary judgment based on

the testimony of five police officers who asserted that they had personal

knowledge of the policy. Id. at 163. The plaintiff in Williams also provided

sufficient proof that the custom was the "moving force" behind the violation of his

rights, because he was physically injured in an altercation that occurred while he

was being moved pursuant to the policy and because there was an expert report, of

questionable admissibility,[10] that concluded that the policy was likely to result in

constitutional violations. Id. at 163-64.

Plaintiff contends that the dumping policy described in Williams extends to

intoxicated individuals and other "undesirables." He supports the existence of the

_____

[10] The Eleventh Circuit brought up the admissibility of the expert report on its own
but did not address the issue because it had not been addressed by the defendant
county or the district court.

policy by submitting copies of two of the same affidavits that were submitted into evidence in the <u>Williams</u> case.[11]  And he alleges that Officer El-Amin applied the policy to Plaintiff by taking him across county lines to Grady Hospital in Fulton County, which apparently is a few miles further from the DeKalb County jail than DeKalb Medical.

Regardless of the existence of a "dumping" policy, Plaintiff cannot show the existence of a constitutional violation, because he cannot show that the policy or custom led to a violation of his rights.  First, the policy, if it exists, was not applied to him.  Unlike in <u>Williams</u>, where the homeless plaintiff was picked up for loitering and transported to an unlit, dark, wooded area in another county, <u>id.</u> at 158, Plaintiff was taken to a nearby hospital in a populated area.  It is not clear how taking an injured person to a hospital is the same or even remotely similar to a policy of transporting homeless people to other localities.  Second, although Plaintiff was shocked that an officer would transport him from DeKalb County to Fulton County, there is no injury and no constitutional violation that results from the mere act of being transported across county lines to a medical facility.  In <u>Williams</u> there was a minimum showing that the policy was causally related to the

_____

[11] Defendants object [111] to the admissibility of Plaintiff's evidence of dumping. Since the existence or non-existence of dumping is not relevant to the disposition of Plaintiff's claim, that motion is denied as moot.

plaintiff being stabbed and beaten by the officer who transported him across county lines. Here, Plaintiff was dropped off at Grady Hospital[12] and had no further interaction with the police. He suffered no injuries that were in any way causally related to a policy of "dumping" undesirable residents in other counties.

The undisputed facts show as a matter of law that Officer El-Amin did not violate Plaintiff's rights by taking Plaintiff to Grady Hospital. DeKalb County therefore is not liable for Officer El-Amin's act of taking Plaintiff to the hospital.

c. Failure To Train

Plaintiff's final theory of liability asserts that DeKalb County is liable for Officers El-Amin and Benton's use of force against Plaintiff during Plaintiff's apprehension and arrest. Plaintiff has not submitted any evidence that DeKalb County has a policy or custom to use excessive force generally or against DUI suspects or suspect that flee specifically. He relies instead on the claim that DeKalb County inadequately trained or supervised the officers and that this failure led to the officers' use of force against Plaintiff.

A municipality may be held liable under Section 1983 when its policy or custom of inadequately training or supervising its officers causes a constitutional injury. AFL-CIO v. City of Miami, 637 F.3d 1178, 1188 (11th Cir. 2011).

---

[12] The Court notes that Grady Hospital is funded by and serves the citizens of DeKalb County and Fulton County.

Liability only arises, however, "'where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)). To establish deliberate indifference, "a plaintiff must put forward some evidence that the municipality was aware of the need to train or supervise its employees in a particular area." AFL-CIO v. City of Miami, 637 F.3d at 1188-89.

"Establishing notice of a need to train or supervise is difficult." Id. at 1189. The Eleventh Circuit has described this requirement as having a "high standard of proof [that] is intentionally onerous for plaintiffs," which is necessary to prevent the discrete doctrine of municipal liability from collapsing into simple respondeat superior liability. Gold, 151 F.3d at 1351 n.10. A municipality ordinarily will be on notice of a need to train or supervise only if there is a "widespread pattern of prior abuse" or if it has knowledge that a particular constitutional violation has occurred. See AFL-CIO v. City of Miami, 637 F.3d at 1189. Whatever the circumstances, "it must have been obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation." Id. The Plaintiff must further show that the municipality made a deliberate choice not to take any action on its knowledge of the need to train or supervise. Id.; Gold, 151 F.3d at 1350-51.

Plaintiff advances three theories that DeKalb County was on notice of the need to train or supervise and was deliberately indifferent to that need: (1) the existence of a widespread pattern of abuse, (2) a need to provide a particular type of training that is so inherently obvious that a widespread pattern is not required, and (3) that DeKalb County was on notice of the particular need to train and supervise Officers Benton and El-Amin.

           i)      Widespread Pattern Of Abuse

In this case, Plaintiff has not submitted any evidence of a widespread pattern of abuse by officers of the DeKalb County Police Department. Plaintiff makes broad accusations in his briefing that such abuses are notorious, but argument in the absence of evidence is not sufficient to satisfy the difficult standard required to impose liability on a municipality for deliberate indifference to the need to train and supervise. The evidence shows that DeKalb County provides training on the use of force, investigates accusations that its officers have used improper force, and provides counseling or punishment to officers when if those accusations are supported by evidence. In the absence of any relevant evidence, the existence of a widespread pattern of abuse cannot be the basis for imposing liability against DeKalb County.

ii) Obvious Need For Training

It may be possible in some cases that the need for training in a particular area is so obvious that a plaintiff may establish deliberate indifference without showing an earlier constitutional violation or pattern of abuse. AFL-CIO v. City of Miami, 637 F.3d at 1189. These circumstances are narrow and limited. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 409 (1997); Gold, 151 F.3d at 1352. For example, the Supreme Court has noted a hypothetical situation where a police force provides firearms to its police officers, in which case the unconstitutional use of deadly force might be "a highly predictable consequence" of failing to train officers in the use of deadly force. City of Canton, 489 U.S. at 390 n.10. This narrow circumstance is not implicated by the facts of this case. As for Officer El-Amin allegedly kicking Plaintiff, there is no evidence that the County has failed to train its officers in the proper use of force, and there is no evidence of any alleged deficiency in training that predictably led to Officer El-Amin harming Plaintiff. The only evidence on this issue indicates that DeKalb County has a policy on the use of force and has trained its officers in the use of force. (Benton Dep. 35:8, 36:5-6). As for Officer Benton striking Plaintiff with a police car, if the act was intentional then it would fall within the County's training on the use of force. (Id.). If the act was accidental, although the scope of the County's training and policies

on pursuing suspects is unclear from the deposition testimony, it cannot be said that accidentally hitting with a police car a suspect who is fleeing on foot is a "highly predictable consequence" of not providing specific training on that situation.

### iii)   Inadequate Training Or Supervision Of Officer Benton

Plaintiff next argues that the County had particular notice of the risk that Officers El-Amin and Benton might cause constitutional injuries, and that the County's steps to train and supervise the officers in light of their histories were deliberately inadequate.  Plaintiff claims, for example, that DeKalb County was deliberately indifferent to the risk that Officer Benton would cause constitutional injuries to members of the public through the reckless operation of his police vehicle.  Plaintiff argues that the County's deliberate indifference is evidence by its failure to provide additional defensive driving training to Officer Benton after he was involved in two minor traffic accidents.

Plaintiff's argument is unpersuasive.  The evidence shows that the DeKalb County Police Department provides defensive driving training to incoming officers at its police academy and that it provides additional defensive driving training every two years.  (Benton Dep. 129:19-130:7).  Benton received defensive driving

training before leaving the academy in February 2007 and took the class again that same year. (Id.).[13]

Plaintiff relies heavily on Officer Benton's involvement in two accidents in the fifteen months before he struck Plaintiff with the police car, which the Police Department concluded were "preventable" and which Plaintiff describes as "reckless." On May 9, 2007, Officer Benton swerved to the right to avoid a car that had suddenly stopped, causing him to collide with a vehicle in the right-hand lane. (Pl.'s Mot. Summ. J. Ex. 7). The Police Department ruled that it was preventable and Officer Benton received written counseling. (Id.). On June 6, 2008, Officer Benton made a U-turn in a parking lot and struck a metal pole, causing moderate damage to his police car. (Id.). The accident was deemed preventable and Officer Benton received a two-day suspension. (Id.).

These two minor traffic accidents are not sufficient to support a conclusion that DeKalb County was deliberately indifferent to the danger that Officer Benton

_____

[13] DeKalb County also provides policies and training on the pursuit of fleeing suspects. (Benton Dep. at 31-32). There is some disagreement about how the policy applied to a police officer using a car to chase a suspect who is on foot. Benton believed that the policy did not apply in those circumstances. (Id. at 99:1-18). There is no evidence, however, that there is a widespread practice of hitting fleeing suspects with cars, intentionally or otherwise. Nor is there any evidence that Officer Benton had ever failed to follow proper procedure in the pursuit of a suspect or that during a pursuit he had failed to take reasonable steps to minimize the danger to the public and the fleeing suspect. The lack of training on this particular area is not a sufficient ground on which to hold DeKalb County liable.

would cause constitutional injury to its inhabitants. First, these small deviations for proper driving principles would not put a county government on notice that the driver was highly likely to engage in constitutional violations, either by an alleged intentional striking of a fleeing suspect or by doing so accidentally. The circumstances of everyday driving compared to a heat-of-the-moment pursuit in the middle of the night are too different for the first kind of mishap to put the County on notice of the danger of the second kind of mishap. Second, even if the County had notice, there is no evidence that the County made a deliberate choice not to act on that knowledge. The undisputed evidence shows that the County took steps to address Officer Benton's accidents. For the first violation, it provided a written warning, and for the second it provided a two-day suspension. There has been no evidence or argument that this was not an appropriate tactic for the Department to take in response to Officer Benton's accidents.

 iv) Inadequate Training Or Supervision Of Officer El-Amin

 Plaintiff also argues that the County was on notice of and indifferent to the danger that Officer El-Amin would cause a constitutional injury by using excessive force. In support, Plaintiff relies on Officer El-Amin's Police Department personnel file, which has record entries indicating that citizen complaints had been filed against El-Amin in the past and which showed he had been disciplined

several times for failing to follow proper police procedures.[14]  Plaintiff's claim

fails for several reasons.

First, Plaintiff relies largely on the documentation in El-Amin's personnel

file of complaints against El-Amin that are unsubstantiated.  As the Eleventh

Circuit has noted, mere allegations of excessive force or a large number of

allegations has little or no evidentiary value in the absence of some measure of the

merit of the allegations.  See Brooks v. Scheib, 813 F.2d 1191, 1193-94 (11th Cir.

---

[14] Defendants object [113] to the admissibility of the documents from Officer El-Amin's personnel file on the ground that they have not properly authenticated. The file, however, appears to have been produced by Defendants during discovery. Federal Rule of Evidence 901(a) only requires enough evidence to support a finding that the evidence in question is what its proponent claims.  The rule does not require conclusive proof of authenticity.  E.g., McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 562 (5th Cir. 1998).  Courts have often held that the circumstances of producing a document to an opposing party is sufficient to meet the minimal standards required for the opposing party to authenticate the document.  See, e.g., Gregg v. Ohio Dep't of Youth Servs., 661 F. Supp. 2d 842, 853 (S.D. Ohio 2009); Shell Trademark Mgmt. BV & Motiva Enters., LLC v. Ray Thomas Petro. Co., 642 F. Supp. 2d 493, 510-511 (W.D.N.C. 2009).  The file in question also contains additional indicia of authenticity, including written signatures and initials of DeKalb County police officials.  Under the facts of this case, and in light of the Court's conclusion that Plaintiff's claim on this issue is ultimately unmeritorious, the Court concludes it is appropriate to review the limited evidence submitted by Plaintiff of Officer El-Amin's past conduct.  The Court agrees, however, that the summary of the evidence that Plaintiff attached is not admissible.  The Court therefore grants the motion in part with respect to the summary of the employment file, and denies the motion with respect to the contents of the employment file.  In the same motion, Defendants also object to the admissibility of Plaintiff's medical records.  These records were not relevant to the issues in this motion and so Defendants' motion is denied as moot as to that issue.

1987) ("Brooks never demonstrated that past complaints of police misconduct had any merit. Indeed, the number of complaints bears no relation to their validity."). There is no measure of the reliability of most of the documented incidents in the record.

Second, the few incidents that were found to have sufficient evidence are significantly different than the circumstances of this case, and they do not support the inference that the County had notice that Officer El-Amin was highly likely to cause constitutional injuries. The sustained complaints include failure to follow documentation procedures, loss of county property, and the failure to arrest a domestic violence suspect. The most egregious violation appears have occurred on April 6, 2006, when an investigation determined that Officer El-Amin used unjustified force when he returned fire at a suspect who had fired at El-Amin and other officers and who was fleeing in an automobile. El-Amin received a 40-hour suspension for that incident. Even taking that incident into consideration, the evidence is insufficient to allow a trier of fact to conclude that Plaintiff has met the difficult burden of showing a deliberate indifference to the danger of future constitutional violations.

Finally, to the extent Plaintiff can show that DeKalb County had knowledge that Officer El-Amin's propensities were likely to lead to future constitutional

injuries, Plaintiff is also required to demonstrate that the County deliberately chose not to act on that knowledge. Plaintiff has not done so. What evidence is available indicates that Officer El-Amin received suspensions and written counseling for his offenses. There were also two express recommendations in 2007 that Officer El-Amin receive additional supervision, counseling, and training, as well as a psychological evaluation. The outcome of these processes is unknown, and Plaintiff has not submitted any evidence that DeKalb County ignored these recommendations. There is no evidence that would allow a rational trier of fact to conclude that DeKalb County deliberately failed to act on the problems with Officer El-Amin's behavior that had been identified.

Plaintiff has failed to submit evidence that would support a finding of liability against DeKalb County on any of the possible theories of municipal liability. For these reasons, summary judgment in favor of DeKalb County, and in favor of Defendants Bolton and Benton in their official capacities, on Plaintiff's constitutional claims under 42 U.S.C. § 1983, is appropriate.

2.    *Individual Capacity Claims Against Former Chief Bolton*

Defendant Bolton was the Chief of the DeKalb County Police Department at the time of Plaintiff's encounter with Officers El-Amin and Benton. Plaintiff

claims Former Chief Bolton is liable for the conduct of Officers El-Amin and Benton by virtue of his supervisory position as the chief of police.

"A supervisor can be held liable for the actions of his subordinates under § 1983 if he personally participates in the act that causes the constitutional violation or where there is a causal connection between his actions and the constitutional violation that his subordinates commit." AFL-CIO v. City of Miami, 637 F.3d at 1190. "This requisite causal connection can be established in the following circumstances: (1) when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so or (2) when a supervisor's improper custom or policy results in deliberate indifference to constitutional rights." Doe v. School Bd. of Broward Cnty., 604 F.3d 1248, 1266 (11th Cir. 2010). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

Plaintiff has failed to submit evidence that Former Chief Bolton is liable in his personal capacity for the claimed constitutional violations by Officers El-Amin and Benton. There is no evidence at all in the record regarding Bolton. To extent Plaintiff's theory of liability rests solely on Former Chief Bolton's position as the

head of the Police Department and his corresponding policymaking authority, the claim fails for the same reasons as the claims against DeKalb County. Plaintiff's conclusory assertions in the briefing that there is a widespread pattern of abuse are insufficient to impose supervisory liability. See Doe v. School Bd. of Broward Cnty., 604 F.3d 1248 ("conclusory assertion of a 'history of widespread abuse' is clearly insufficient to put [defendant] on notice of an ongoing constitutional deprivation"). The claim fails for the further reason that Plaintiff has not submitted any evidence of any policy decision or policy omission by Former Chief Bolton that had any causal relationship to Plaintiff's injuries. Finally, Plaintiff has not submitted any other evidence of specific acts by Bolton, such making recommendations for or against certain punishments for El-Amin's past infractions, or making any other decision that directly or indirectly enabled or condoned Officer El-Amin's alleged conduct.

Summary judgment is therefore required to be granted in favor of Former Chief Bolton in his personal capacity on Plaintiff's Section 1983 claims.

    3.    *Claims Against Officer Benton In His Individual Capacity*

Qualified immunity protects government officials who perform discretionary functions from suits in their individual capacities, unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person

would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted). "A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Benton v. Hopkins, 190 F. App'x 856, 858 (11th Cir. 2006).

To be protected by qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194 (internal quotation marks omitted). Here, it is undisputed that Officer Benton acted within his discretionary authority in pursuing and apprehending Plaintiff.

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. The Supreme Court has set forth a two-part test for determining if a defendant is entitled to qualified immunity. "'The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's

allegations, if true, establish a constitutional violation.'" Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 736 (2002)). If a constitutional right would have been violated under the plaintiff's version of the facts, "a plaintiff must show that the right violated was clearly established." Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009).[15]

Determining whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable state actor that his conduct was unlawful in the situation he confronted." Id. at 202. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id.

---

[15] The Supreme Court has held that courts have discretion to decide in which order they address whether a constitutional violation occurred and whether the violated right was clearly established. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). For claims of excessive force in violation of the Eighth or Fourteenth Amendments, however, the Eleventh Circuit requires courts to inquire only whether there is an underling constitutional violation. Fennell, 559 F.3d at 1216-17 & n.6. This is because the subjective element necessary to establish excessive force claims is so extreme that if the violation occurred it invariably caused a constitutional injury. Id.

There are two possible claims against Officer Benton: First, that he lacked probable cause to detain and arrest Plaintiff, in violation of the Fourth Amendment; and, second, that Officer Benton used excessive force in violation of the Fourth or Fourteenth Amendments to apprehend Plaintiff.

a. False Arrest

A law enforcement official is entitled to qualified immunity a claim of false arrest so long as there was probable cause or arguable probable cause to believe that an individual has committed even a very minor offense in the official's presence. Coffin v. Brandau, 642 F.3d 999, 1006 (11th Cir. 2011); Lee v. Ferraro, 284 F.3d 1188, 1194-95 (11th Cir. 2002). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Coffin, 642 F.3d at 1006-07. This requires more than mere suspicion, but less than what would exist to support a conviction. Id. at 1007. "Arguable probable cause exists where reasonable officers in the same circumstances and with the same knowledge as the defendant could have believed that probable cause existed." Id.

Evaluating the situation using the facts on which Officer Benton was entitled to rely, he had at least arguable probable cause to detain Plaintiff. Officer Benton did not arrest Plaintiff, but merely detained him briefly while Officer El-Amin made the arrest. Officer Benton left shortly thereafter and had no further involvement in the events of which Plaintiff complaints. Officer Benton's actions were objectively reasonable judged in comparison with his limited involvement. See, e.g., Payne v. DeKalb Cnty., 414 F. Supp. 2d 1158, 1175 (N.D. Ga. 2004) (where first officer lacked probable cause to arrest suspect, second officer's decision to arrest was objectively reasonable where second officer was responding to first officer's request for assistance, second officer reasonably relied on first officers description of situation, and facts judged from second officer's point of view supported probable cause).

The undisputed facts support that Officer Benton heard a radio call about a fleeing suspect. Officer Benton responded to the scene of the alleged flight, and saw Plaintiff, who matched the description of the fleeing suspect. Officer Benton was justified in believing that Plaintiff was obstructing justice by fleeing from Officer El-Amin even if, taking Plaintiff's story as true, Plaintiff was not running at that moment. Officer Benton then detained Plaintiff momentarily while Officer El-Amin, who had called for assistance, made the arrest. Officer Benton's belief

that Plaintiff was the person identified by Officer El-Amin was correct.  And

although Plaintiff alleges he was not fleeing from Officer El-Amin (though he may

have been jogging away),[16] it was reasonable under the circumstances for Officer

Benton to believe that a hit-and-run suspect was fleeing from Officer El-Amin.

Officer Benton then left the scene and had no further involvement with Plaintiff.

Based on the undisputed facts in the record, there is no factual basis that would

support that Officer Benton lacked at least arguable probable cause to briefly

detain Plaintiff.

### b.  Striking Plaintiff With Police Car

Plaintiff also asserts that Officer Benton violated Plaintiff's constitutional

rights when Officer Benton struck Plaintiff with the police car.  To address this

claim requires a determination of whether the Fourth Amendment seizure standard

or the Fourteenth Amendment substantive due process standard applies, which

depends on when a seizure occurred.  See Cnty. of Sacramento v. Lewis, 523 U.S.

833, 843-44 (1998).  The pursuit of a suspect with the purpose of seizing that

suspect is not a Fourth Amendment seizure.  Lewis, 523 U.S. at 843-44.  It is not

enough for a Fourth Amendment seizure to occur that the government actor both

desires to terminate the individual's freedom of movement and actually causes the

---

[16] Plaintiff acknowledged that it may have been perceived that he was fleeing.

termination of the individual's freedom of movement.  Id. at 844.  A government

seizure only occurs "when there is a governmental termination of freedom of

movement *through means intentionally applied*."  Id. (quoting Brower v. Cnty. of

Inyo, 489 U.S. 593, 596-97 (1989)).

The Supreme Court has specifically observed that "no Fourth Amendment

seizure would take place where a 'pursuing police car sought to stop the suspect

only by the show of authority represented by flashing lights and continuing

pursuit,' but accidentally stopped the suspect by crashing into him."  Id. (quoting

Brower, 489 U.S. at 597).  Thus, an initial question is whether the evidence

supports that Officer Benton intentionally struck Plaintiff with the police car, or if

instead the facts demand the conclusion that it was an accident.  If Officer Benton

accidentally struck Plaintiff, then there was no seizure at that time and only a

Fourteenth Amendment is required to be applied.[17]  See id. at 837, 843-44 (no

seizure where police pursue fleeing motorcycle at 100 mph, motorcycle tips over

and skids, and police car accidentally strikes and kills motorcycle passenger);

Thomas v. City of Columbus, 198 F. Supp. 2d 1360, 1366 (M.D. Ga. 2002)

(applying Fourteenth Amendment analysis where officer struck with car a suspect

_____

[17] If, on the other hand, the evidence is sufficient to support a finding of
intentionality, then the type of analysis that applies depends on whether the force
was applied to terminate Plaintiff's freedom of movement (Fourth Amendment
analysis) or for some other purpose (Fourteenth Amendment).

who was fleeing on foot because there was no evidence in that case that officer intentionally struck the suspect in order to stop the suspect from fleeing).

The evidence before the Court is not sufficient to support a conclusion that Officer Benton intentionally struck Plaintiff.  Taking Plaintiff's testimony as true, he was standing in the parking lot when he heard Officer Benton's police car approaching behind him, turned to face the car, and was struck in the knee by the bumper of Officer Benton's patrol car.  Plaintiff's version of events is consistent with Officer Benton intentionally or unintentionally striking Plaintiff.  But there is no other evidence in the record to support that Officer Benton intentionally hit Plaintiff.  On the other hand, the evidence that Plaintiff's feet never left the ground, that he was only bruised in the knee, that he was not bleeding, that he did not complain of any injuries, that he did not ask for medical treatment, and that he did not take the opportunity to seek medical care when he was at a hospital, all support that Officer Benton's car was not moving that fast by the time it struck Plaintiff. This further supports that Officer Benton was not trying to hit Plaintiff, that he had applied his breaks, and that he was slowing down.  It is difficult to otherwise imagine how Plaintiff could have been struck by the police car without his feet

leaving the ground and without sustaining injuries more serious than a bruised knee.[18]

The differing testimony of Plaintiff and Officer Benton does not create a genuine dispute of fact about Officer Benton's intent, but rather it affects the level of care taken by Officer Benton and the extent to which Plaintiff's conduct may have precipitated the accident. There is no other evidence with any bearing on Officer Benton's intent. A reasonable jury could not conclude on this record that Officer Benton intentionally struck Plaintiff.

Since Officer Benton did not intentionally strike Plaintiff, he did not intentionally use his police car to terminate Plaintiff's freedom of movement. Officer Benton's seizure of Plaintiff therefore occurred after he struck Plaintiff, and the act of hitting Plaintiff with the car was not a Fourth Amendment seizure. It must be analyzed under the substantive due process requirements of the Fourteenth Amendment.

Officer Benton's conduct violated substantive due process if it "shocks the conscience." Lewis, 523 U.S. at 846. This test is not subject to mechanical application and requires an examination of the circumstances of the claimed violation. See id. at 850-51. In situations where officers are called upon to make

---

[18] Had Officer Benton intended to harm Plaintiff by hitting him with a moving automobile, the injury would have been substantially more serious.

instant judgments and to act quickly, such as in pursuit situations, the Fourteenth

Amendment is only violated where the officer has intent to cause the suspect harm.

Id. at 854.  Under Lewis, negligence or recklessness by Officer Benton is not

sufficient to constitute a violation of substantive due process under the Fourteenth

Amendment.  Summary judgment is therefore required to be granted in favor of

Officer Benton in his personal capacity on Plaintiff's claim that Officer Benton

violated Plaintiff's constitutional rights by bruising his leg when it was impacted

by Officer Benton's police car bumper.[19]

     D.    Plaintiff's State Law Claims

Plaintiff asserts a large number of state law claims against Defendants,

including assault, battery, kidnapping, false arrest, false imprisonment, malicious

---

[19] Under some versions of the facts, this was an atypical pursuit case, since
Plaintiff claims he was not fleeing.  But the undisputed facts are that Officer
Benton was responding to a call about a fleeing suspect, which called for
immediate action, and to the extent the circumstances might justify a standard of
recklessness or some other lesser standard, Plaintiff has not pointed to any clearly
established law that would put Officer Benton on notice that such a lesser standard
would govern his conduct.  See, e.g., Cannon v. Taylor, 782 F.2d 947, 950 (11th
Cir. 1986) (injuries caused by officer's negligent or grossly negligent operation of
police vehicle not actionable under Section 1983); Walton v. Salter, 547 F.2d 824
(5th Cir. 1976) (actions of officer which were negligent and in willful and wanton
disregard for the safety of others not actionable under Section 1983).  While the
Court concludes that the facts and rationale of Lewis compel the application of
Lewis's intentional-harm requirement to this case, at the very least the application
of a lesser standard of intent would not apply against Officer Benton on the basis
of qualified immunity.

prosecution, intentional infliction of emotional distress, negligent hiring, training, supervision, and retention, violation of ministerial duties, negligence, and violations of Georgia's RICO Act.

### 1. *Claims Against DeKalb County*

Plaintiff's claims against DeKalb County, and by extension his claims against the Former Chief Bolton and Officer Benton in their official capacities, are subject to sovereign immunity. The Georgia Constitution states that "sovereign immunity extends to the state and all of its departments and agencies." Ga. Const. art. I, § II, ¶ IX. The Georgia Supreme Court has held that the Georgia Constitution's grant of sovereign immunity applies to counties. Gilbert v. Richardson, 452 S.E.2d 476, 479 (Ga. 1994). Sovereign immunity "can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. art. I, § II, ¶ IX(e); see also Ga. Code Ann. § 36-1-4 ("A county is not liable to suit for any cause of action unless made so by statute.").

Plaintiff's claims against DeKalb County are barred unless Plaintiff can show that the County's sovereign immunity with respect to those claims has been waived by some legislative act. Woodard v. Laurens Cnty., 456 S.E.2d 581, 582 (Ga. 1995). A waiver requires authorization by the General Assembly and thus the

mere purchase of liability insurance by a county does not waive immunity. Id. (citing Donaldson v. Dep't of Transp., 414 S.E.2d 638 (Ga. 1992)). Plaintiff must point to some other basis to support that valid waiver of DeKalb County's sovereign immunity.

As noted in the section addressing Plaintiff's Motion for Summary Judgment, supra § II.B, the Georgia General Assembly has waived DeKalb County's sovereign immunity for personal injuries in the amount of $500,000 per person per accident for negligence arising out of the County's employees' use of the County's motor vehicles. Plaintiff's state law claim arising from Officer Benton's claimed negligence may therefore be asserted against DeKalb County, regardless of whether the doctrine of official immunity bars the claim against Officer Benton in his official capacity. See Gilbert, 452 S.E.2d at 484 ("[W]e hold that the official immunity of a public employee does not protect a governmental entity from liability under the doctrine of respondeat superior. A county may be liable for a county employee's negligence in performing an official function to the extent the county has waived sovereign immunity."). Plaintiff's state law negligence claim against the County arising from Officer Benton accidentally striking Plaintiff with the police car is sufficient to survive summary judgment.

As for Plaintiff's other claims, he has not submitted any statutory provision that waives DeKalb County's immunity from liability under state law. The Georgia Tort Claims Act, Ga. Code Ann. § 50-21-20 et seq., does not waive the sovereign immunity of counties. Woodard, 456 S.E.2d at 582; Ga. Code Ann. § 50-21-22(5) (excluding "counties" from Georgia Tort Claims Act). Plaintiff argues that the Georgia RICO Act waives sovereign immunity because it applies against "any person," and a county may be considered a person. This language, however, does not "specifically provide[] that sovereign immunity is thereby waived" and it does not provide for the "extent of such waiver." Ga. Const. art. I, § 2, ¶ IX. The language of the RICO statute does not evidence intent by the General Assembly to waive the sovereign immunity of Georgia counties and Plaintiff has not cited any cases supporting that interpretation or allowing a lawsuit to proceed against a Georgia county on that theory. The Court therefore concludes that—with the exception of the claim against DeKalb County for Officer Benton's allegedly negligent operation of his police vehicle—summary judgment is required to be granted in favor of DeKalb County and the Defendants in their official capacities on Plaintiff's state law claims. The negligence claim, however, may proceed against DeKalb County.[20]

---

[20] The redundant official capacity claim against Officer Benton is also dismissed.

### 2. Claims Against Former Chief Bolton And Officer Benton In Their Individual Capacities

Plaintiff also asserts his state law claims against Former Chief Bolton and Officer Benton in their individual capacities. These claims implicate Georgia's doctrine of official immunity. "Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure." <u>Cameron v. Lang</u>, 549 S.E.2d 341, 344 (Ga. 2001); <u>Gilbert</u>, 452 S.E.2d at 483 (quoting Ga. Const. art. I, § II, ¶ IX(d)). "'A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.'" <u>Payne v. DeKalb Cnty.</u>, 414 F. Supp. 2d 1158, 1183 (N.D. Ga. 2004) (quoting <u>Harvey v. Nichols</u>, 581 S.E.2d 272, 276 (Ga. Ct. App. 2003)). "A discretionary act, on the other hand, 'calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.'" <u>Id.</u> (quoting <u>Harvey</u>, 581 S.E.2d at 276).

Responding to calls for assistance and pursuing and detaining suspects are discretionary acts rather than ministerial ones. <u>See</u> <u>Cameron</u>, 549 S.E.2d at 345-46. Similarly, decisions relating to the operation of a police department, including issues of training and supervision, are discretionary acts. <u>See</u> <u>Middlebrooks v.</u>

Bibb Cnty., 582 S.E.2d 539, 543-44 (Ga. Ct. App. 2003). Former Chief Bolton

and Officer Benton are therefore shielded against Plaintiff's state law claims unless

Plaintiff can show that they acted with malice or an intent to cause injury. See

Cameron, 549 S.E.2d at 346.

The bar for proving malice or an intent to cause injury is a high one. For the

purposes of official immunity,

> actual malice requires a deliberate intention to do wrong and denotes
> express malice or malice in fact. Actual malice does not include
> implied malice, or the reckless disregard for the rights and safety of
> others. A deliberate intention to do wrong such as to constitute the
> actual malice necessary to overcome official immunity must be the
> intent to cause the harm suffered by the plaintiffs. Likewise, the
> phrase "actual intent to cause injury" has been defined in a tort
> context to mean an actual intent to cause harm to the plaintiff, not
> merely an intent to do the act purportedly resulting in the claimed
> injury. This definition of intent contains aspects of malice, perhaps a
> wicked or evil motive.

Marshall v. Browning, 712 S.E.2d 71, 74 (Ga. Ct. App. 2011) (quoting Selvy v.

Morrison, 665 S.E.2d 401, 404-05 (Ga. Ct. App. 2008)); see also Williams v.

Solomon, 531 S.E.2d 734, 736 (Ga. Ct. App. 2000) ("conduct exhibiting a reckless

disregard for the safety of others does not equate with the actual malice necessary

to defeat a claim of official immunity").

The evidence before the Court is not sufficient for Plaintiff's claims against

Former Chief Bolton to survive summary judgment. There is no evidence that

Former Chief Bolton acted, or failed to act, out of malice for Plaintiff or any other individual.   Nor is there any evidence that Bolton intended to cause harm.  Finally, there is no evidence that Bolton knew about the complaints against Officer El-Amin for using force, or whether those complaints had any factual merit, or whether Bolton took any action at all with respect to El-Amin or Officer Benton. For these reasons, and also for the reasons that Plaintiff's Section 1983 claims against Former Chief Bolton fail, the Court concludes on the basis of the record before it that summary judgment is required to be granted in Former Chief Bolton's favor on Plaintiff's state law claims against Bolton in his personal capacity.

For Officer Benton, as mentioned in the section on Benton's Section 1983 liability in his personal capacity, supra § II.C.3.b, the evidence is not sufficient to support the conclusion that Officer Benton intentionally struck Plaintiff with the police car.  Similarly, there also is no evidence to support that Officer Benton lacked probable cause to detain Plaintiff or that Officer Benton did so with malice or intent to injure Plaintiff, supra § II.C.3.a.  The evidence further shows that Plaintiff left soon after detaining Plaintiff and had no further involvement with Plaintiff.  There is thus no basis to conclude that Officer Benton had the malice or intent to injure Plaintiff that is necessary to pierce Officer Benton's official

immunity as to any of the state law claims asserted against Officer Benton. Summary judgment on the state law claims against Officer Benton in his individual capacity is therefore required to be granted.[21]

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment [87] is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** on the issue whether DeKalb County's sovereign immunity has been waived for injuries of up to $500,000 arising from Officer Benton's negligent use of its motor vehicles.  The Motion is **DENIED** on the issue of Officer Benton's negligent operation of his police vehicle.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [85] is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to DeKalb County's liability under Section 1983, **GRANTED** for all state law claims against DeKalb County except those arising from Officer Benton's claimed negligence, and **DENIED** as to DeKalb County's liability for the

_____

[21] Plaintiff also moves to strike [122] Defendants' Corrected Reply in support of their motion for summary judgment.  The Court sees no prejudice to Plaintiff from the untimely submission, which only corrects Defendants' description of certain case law that the original Reply may have inadvertently described as being stronger in Defendants' favor than it is.  Plaintiff's motion is denied.

state law negligence claim arising from Officer Benton's claimed negligent operation of his police vehicle. The Motion is **GRANTED** as to all claims against Former Chief Terrell Bolton and Officer Benton in their individual and official capacities.

**IT IS FURTHER ORDERED** that the parties' evidentiary and procedural motions [111, 113, 115, 122] are disposed of as noted within this Order and Opinion.

**SO ORDERED** this 17th day of February, 2012.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE